From Luke H. Frasher, Uniontown, Pa.

---

## Public Supply of Water by Coal Companies.

*Water supply — Bituminous coal companies — Permit from Secretary of Health—Acts of April 22, 1905, and June 7, 1923.*

Where corporations organized to mine bituminous coal construct water-works and supply water for domestic purposes to the inhabitants of mining villages living in houses owned by such companies, they are supplying water to the public within the meaning of section 3 of the Act of April 22, 1905, P. L. 260, and the Act of June 7, 1923, P. L. 498, and should obtain a written permit from the Secretary of Health so to do.

Department of Justice. Opinion to Hon. Theodore B. Appel, Secretary of Health.

BALDRIGE, Att'y-Gen., Dec. 5, 1927.—This department is in receipt of your letter of recent date, asking to be advised whether certain bituminous coal companies are supplying water to the "public" within the meaning of section 3 of the Act of April 22, 1905, P. L. 260, which reads as follows: "No . . . private corporation, company or individual shall construct water-works for

the supply of water to the public . . . without a written permit, to be obtained from the Commissioner of Health. . . ."

The circumstances under which this water is supplied you describe as follows:

"In the bituminous coal regions of Pennsylvania, it is believed to be a common practice for a coal company to select a spring, well or surface stream as a source of water, or to make a contract for a supply of water with a nearby water company or municipality, and convey such water, by means of a system of pipes, to the village wherein the coal company's employees dwell.

"Sometimes the water is supplied to the inhabitants of the village by means of hydrants in the streets or on the premises; sometimes the water is piped within the houses; sometimes, apparently, no charge whatever is made for the water; sometimes it is understood that the rent of the houses includes furnishing the water, and sometimes water rent is specifically mentioned in the lease for the house and constitutes a charge separate from the rent of the house."

"Water-works" has been defined as "a term that includes streams, springs, wells, pumps, engines and all machinery, lands, buildings and things for supplying, or used for supplying, water:" 40 Cyc., 846. See, also, Randall v. Smith, 51 So. Repr. 917; 8 Words and Phrases, 7417.

It may properly be assumed that the coal companies referred to have constructed water-works and are furnishing water for human consumption. The more difficult question for determination is, are these coal companies engaged in the "supply of water to the public" as contemplated by the Act of 1905? If so, they should obtain written permits from the Secretary of Health.

The word "public" does not have a fixed or definite meaning. It is variously used, and a reference to the cases will show that it has widely different meanings as used in acts of assembly whose objects are dissimilar. As stated in Huston Township Poor District v. Benezette Township Poor District, 135 Pa. 393, 398: "The word 'public' is a convertible term, and when used in an act of assembly, may refer to the whole body politic; that is to say, to all the inhabitants of the State, or to the inhabitants of a particular place only; it may be properly applied to the affairs of the State or of a county or of a community. . . ."

In the case of State v. Luce, 32 Atl. Repr. (Del.) 1076, the court said: "When, with reference to an alleged nuisance, the people or citizens of a neighborhood, or the public, are mentioned, it does not mean all the people, or all the public, but only such considerable number of them as to show that more than a few merely are meant. . . . The term 'public' does not mean all the people, nor most of the people, nor very many of the people of the place, but so many of them as contradistinguishes them from a few. . . ."

On the other hand, there are many definitions of the word "public" which, if considered alone, might seem to indicate that the coal companies here in question are not supplying water to the "public." These latter definitions, however, do not involve the word "public," as used in a statute which has been enacted as a police regulation, "for the protection of public health."

The Supreme Court, in the case of Com. v. Emmers, 221 Pa. 298, in discussing the Act of 1905, said: ". . . The statute was passed in the exercise of the police power of the State. That power undoubtedly extends to all regulations affecting the health, good order, morals, peace and safety of society. All sorts of restrictions and burdens are imposed under this power, and when these are not in conflict with any constitutional prohibition or fundamental principle, they cannot be successfully assailed in a judicial tribunal. That

the preservation of the waters of the State from pollution, involving danger to health, is a proper subject for the exercise of the police power cannot be seriously questioned."

The purpose of the legislature in enacting the statute is shown quite clearly in the language found on page 312 of the above opinion: ". . . This statute required every individual, corporation or municipality supplying the public with water to file in the office of the Health Department of the State a statement of its source of supply. It requires every municipality which, at the time of the adoption of the statute, was maintaining a system of sewerage to file in that department a plan thereof. These provisions necessarily result in making a matter of public record, in the office of the Commissioner of Health, the sources from which the public water supply of every community in the State is taken, and a like record of every opening of a public sewer system into the waters of the State. Should an epidemic develop in any community, the health authorities immediately have accurate information as to the source from which the public water supply of that community is derived and whether any public sewer system is discharged into the water. The State legislation requiring physicians in municipalities to make reports to the health authorities of all cases of diseases will place at the disposal of the Commissioner of Health information as to the health conditions existing in the municipalities using the various public sewer systems. The Commissioner of Health and officers under his control will thus constantly have a large part of the information necessary to deal with the health conditions of any community."

Thus the purpose of this legislation as above defined would seem to embrace as well the case of a supply of water to the inhabitants of a mining village living in "company" houses, which water is supplied by such company to its own tenants and none other, as to the case of the supply of water to all the people requiring such service in an entire "town, borough, city or district" by a company incorporated, under paragraph 9 of section 2 of the General Corporation Act of 1874, for "the supply of water to the public." Whether the people served live in "company" houses and receive their supply of water from the company for which they work or whether they receive it, along with other members of the community in which they live, from an incorporated water company would not seem to be a fair test of whether or not they are comprehended within the meaning of the word "public" as used in this statute, which has to do with the important problem of the protection of "public" health. The public complexion of the group served and the general public injury that might follow from serving impure water to such a group of people should not be permitted to be obscured by a reference to the powers, purposes and obligations of the corporation serving.

In support and explanation of the foregoing, the following text excerpts, well fortified by authority, may be cited:

"It is well settled that, in construing any statute, all the language shall be considered, and such interpretation placed upon any word or phrase appearing therein as was within the manifest intent of the body which enacted the law. The proper course in all cases is to adopt that sense of the words which best harmonizes with the context and promotes in the fullest manner the policy and objects of the legislature. . . :" 25 Ruling Case Law, 988.

"Among the statutes which have been declared to be remedial in their nature and consequently entitled to liberal construction are those seeking the correction of recognized errors and abuses by introducing some new regulation for the advancement of the public welfare; . . . laws and regulations necessary for the protection of *health*, morals and safety of society. . . :" 25 Ruling Case Law, 1079.

The fact that we are dealing with a statute designed to protect the public health should, therefore, be given paramount consideration in its interpretation and construction. That the companies supplying this water have not condemned and dedicated to the public use certain sources of water supply, or that they do not possess the power so to do, so that undeniably they are "private use" as distinguished from "public use" corporations does not mean that they cannot supply water to the "public" within the meaning of this act. An interesting parallel is found in the case of Com. v. Kennedy, 240 Pa. 214, where the defendant contended that, since only the riparian owners and not the public generally have an interest in a private stream, the pollution of such a stream could result only in a private injury and not in a public injury. In repudiating this contention, the court said, page 220: "The act (same act here under consideration) defines 'waters of the State' to mean 'all streams and springs and all bodies of surface and ground-water, whether natural or artificial, within the boundaries of the State.' This does not make all such streams public streams, but it does subject them to police control, because, while not public streams, they are susceptible of being turned into public nuisances. . . . We simply repeat that it is not necessary to constitute a public nuisance in running water that the stream should be a public stream."

Thus, it is not necessary that a company should hold itself out to supply water generally to all of the public of a given locality in order to endanger the public health from an impure water supply; the public health may as readily be endangered by the supply of impure water for domestic purposes to people living exclusively in the "company" houses of a mining village as by a similar supply to all the people of a certain "town."

In other words, even though the purpose, the powers and the obligations of a corporation are not such as to make *it*, technically speaking, a "public use" corporation, the recipients of the water may still be enjoying a service which is charged with "public" attributes, within the meaning of a health protection act.

In addition, the Administrative Code of June 7, 1923, § 1802, P. L. 498, practically re-enacts section 8 of the Act of April 27, 1905, P. L. 312, by providing as follows: "The Department of Health shall have the power, and its duty shall be: *(a)* To protect the health of the people of this Commonwealth and to determine and employ the most efficient and practical means for the prevention and suppression of disease."

This shows a deliberate effort on the part of the legislative body to give to the Health Department a general blanket authority to employ the most efficient and practical means, in each and every case arising, for the prevention and suppression of disease, to the end that the health of the "people of this Commonwealth" may be protected.

We believe that the word "public," as used in section 3 of the said Act of April 22, 1905, was intended to have much the same meaning as "people of this Commonwealth," as used in section 1802 above, and we find further evidence of this in the title of the Act of April 22, 1905, where reference is made to the "public health." See Dixon v. Sheffer, 46 Pa. Superior Ct. 452.

We are accordingly of the opinion, and so advise you, that where bituminous coal companies construct water-works and supply water for domestic purposes to the inhabitants of a mining village, they are supplying water to the public within the meaning of section 3 of the Act of April 22, 1905, P. L. 260, and the Administrative Code of June 7, 1923, P. L. 498, and should obtain a written permit from the Secretary of Health so to do.

From C. P. Addams, Harrisburg, Pa.